## CAMPBELL AND RICKARBY *v.* ALFRED PENN. BRADLEY, WILSON & CO., Intervenors.

*B., W. & Co.*, on the third of June, sold cotton to one *S.*, through a broker; but being fearful that the purchase money would not be paid, instead of giving an order for the cotton, in favor of the purchaser, on the proprietor of the press where it was on storage, they gave the order in favor of the broker. On the 5th of June, *S.*, the purchaser, obtained from *C.* and *R.* an advance on the cotton, and on the 7th of June, a further advance from the same parties. On the 6th of June, *S.* ordered the broker to transfer the cotton on the books of the press, to *C.* and *R.*, which was done by making an entry: "From *B., W. & Co.*, to *C., R. & Co.*" A part of the cotton had been weighed; the balance had not passed the scales. *S.* absconded, and *B., W. & Co.* refused to deliver the cotton. It was held, that the cotton which had been weighed, was liable for the advances. That which had not been weighed, was not liable. For, although it was wholly delivered by *B., W. & Co.* to the broker for the purpose of being delivered to their vendee, yet it was only partly delivered by the broker, to the latter.

The agreement amounts to the sale between the parties; the delivery completes it as to third persons.

The delivery of part of a divisible thing, is a delivery of that part alone, and not of the whole. The actual delivery of the whole, in block, completes the sale, even as to third persons, though the article is not counted, weighed or measured.

The secret instructions of a party to his agent, will not qualify the apparent absolute control and dominion with which he has thought proper to invest him. *Slidell*, J.

Where one of several parties must suffer, the loss should fall on that party who, by his imprudent confidence, has enabled the wrong-doer to get credit with innocent third persons, to which, upon the true, but hidden state of facts, he would not be entitled. *Slidell*, J.

Although the advance be not simultaneous with the possession, the privilege attaches as soon as possession is acquired, in pursuance of the antecedent promise, and is effective when adverse rights have not in the mean time been acquired. *Slidell*, J.

<div style="margin-left:0">

CAMPBELL
v.
PENN

</div>

APPEAL from the Fourth District Court of New Orleans, *Strawbridge,* J. *Hunton* and *Bradford,* and *Wolfe* and *Singleton,* for plaintiffs. *Benjamin* and *Micou,* for *Bradley, Wilson & Co.* By the court:

PRESTON, J. This is one of the great number of cases, in which the buyers and sellers of the vast products in our market, are defrauded by fraudulent speculators, and in which one or the other, or both, must suffer.

It is clearly established by the evidence, that *Bradley, Wilson & Co.,* on the 3d of June, 1851, through the instrumentality of *N. B. Keene,* a cotton broker, sold to one *Simpson,* 734 bales of cotton. The cotton was on storage, in a press, and on the same day they gave the following order, to the keeper of the press : "*A. Penn, Esq.,* Union Press, will please deliver to *N. B. Keene,* seven hundred and thirty-eight bales of cotton.           BRADLEY, WILSON & Co."

There is kept in the cotton presses a book, called the "black book." When cotton is sold through the intervention of a broker, it is entered and described in the columns of this book, and the broker heads it, " From A. B., seller, to C. D., buyer." It corresponds with a custom in London, for the broker to give to the buyer a note of the sale, called " a sold note," and to the seller a like note, called "a bought note." In this case, on the day of sale, *Keene* entered the cotton, with its marks, in the black book, but without a heading, as it would seem, from a knowledge that *Simpson* was in the habit of consigning his purchases for advances, and as a means of insuring payment.

On the 5th of June, *Simpson* obtained, from *Campbell* and *Rickarby,* an advance of $14,000 on the cotton; and, on the 7th of June, a further advance of ten thousand dollars.

On the 6th of June, 1851, while these advances were being made, *Keene,* by the order of *Simpson,* transferred the cotton, by heading the entry in the black book, "From *Bradley, Wilson & Co.* to *Campbell, Rickarby & Co.,*" and signed it. On the same day, he signed and gave an order to the press, in these words : " Union Press will please compress, and send on board the ship Epaminondas, the undermentioned cotton, as entered on the black book," describing 611 bales ; and, on the 7th of June, gave a like order, to compress and send a hundred bales on board the ship Sallie Fearn. The orders were delivered to *Campbell* and *Rickarby,* as appears by their endorsements, to send the cotton on board as soon as possible.

On the 7th of June, *Simpson* absconded, without paying for the cotton. Four hundred and sixty bales had been actually weighed, and partly shipped on board the ship Epaminondas. The balance of the cotton had not passed the scales, and *Bradley, Wilson & Co.* stopped the further weighing, and claimed the whole of the cotton. *Campbell* and *Rickarby* sequestered and claimed the whole, as transferred to them by *Simpson,* for their advance of twenty-four thousand dollars.

The pretensions of the plaintiffs, amount to a claim for advances upon cotton, consigned to their order by the owner ; those of *Bradley, Wilson & Co.,* to a recision of the sale of the cotton to *Simpson,* for non-payment of the price.

There is no want of good faith in these transactions, on the part of either the plaintiffs or intervenors. One or the other must suffer, by the frauds of an unfaithful cotton speculator. The immense losses to honest merchants, from like causes, have not taught them so to arrange with each other, that, in cash sales, delivery and payment should be simultaneous.

The whole controversy in this case, as in all those of like character that have gone before, is as to the delivery of the cotton. The rule of law is unbending. The agreement, amounts to the sale between the parties ; the delivery, completes it as to third persons. *Parker* v. *Starkweather*, 7 U. S. 483. *Erwin, McLaughlin & Co.* v. *Torrey*. *Laughlin* v. *Ganal*, 11 R. R. 140.

It is fully established by the evidence, that *Bradley, Wilson & Co.* sold the cotton to *Simpson*, and that the latter consigned it to the order of *Campbell* and *Rickarby*, who made the advances on the consignment. If the advance was made upon cotton actually delivered to the consignees, their privilege for the advance takes precedence of the vendors' lien. Did, then, the vendors deliver the cotton to *Simpson*, and he to his consignees, are the questions to be solved.

In considering the question of delivery, the district judge has made an all-important observation, that must be carefully borne in mind. The case is one of a double delivery, from vendor to vendee, and from vendee to the consignee. It took place, however, through the agency of the same person, the broker, who, in addition to his appropriate duty of making the sale, was employed by the parties to make deliveries. *Bradley, Wilson & Co.*, on account of a distrust of *Simpson*, charged *Keene*, the broker, with their delivery to him, and *Simpson* directed the same *Keene* to make his delivery to *Campbell* and *Rickarby*. For the order of *Bradley, Wilson & Co.*, to *Penn*, was to deliver the cotton to *Keene*. This was not, as contended, an order to deliver it to *Simpson* ; but, as proved, was purposely intended to be otherwise ; and, in fact, the cotton never was transferred on the black book to *Simpson*.

If *Bradley, Wilson & Co.* had themselves, or by their agent, placed the whole of the cotton in the possession of their vendee, though only symbolically on the black book of the cotton press, it seems so well established, by the usages of trade, that this would have been a delivery, that we could not resist, how ever much disposed, to favor real, rather than fictitious transactions. But, as they took the precaution to place it in the name of their agent, for the very purpose of avoiding a constructive delivery to *Simpson*, they are entitled to the benefit of that precaution. Much less had *Keene* power, from *Bradley, Wilson & Co.*, to transfer the cotton symbolically on the black book from them to *Campbell* and *Rickarby*. He had no power, from them, to deliver the cotton to, or consign it to, the order of *Campbell* and *Rickarby* at all. The latter made no advance to the factors, and do not pretend to have received the cotton from them. They made their advances to *Simpson*, and contend that they received the cotton from him. Then *Keene* placed it on the black book in their name, by *Simpson's* order, and not by the authority of *Bradley, Wilson & Co.* So that *Simpson* made a symbolical delivery, on the black book, to his consignees, before he had obtained a symbolical delivery on the same book himself, from his vendors.

The case is made plainer, by supposing two agents, one for the vendor, and one for the vendee. The agent of the vendor had power to place the cotton in the name of the vendee, on the black book, but did not do so. The agent of the vendee made a transfer on the black book, from the vendor to the consignees of the vendee, but had no power from the vendors to do so, and therefore the consignees derived no title from the transfer.

We, therefore, regard the transfer on the black book, from *Bradley, Wilson & Co.* to *Campbell* and *Rickarby*, as made without authority, and divesting the former of no rights, and as conveying none from them to the latter. In fact, it

implies what is not true, that *Bradley, Wilson & Co.* sold, or transferred, the cotton to them, whereas, they had no transaction whatsover with them.

It is strenuously contended, that the order of *Bradley, Wilson & Co.*, to deliver the cotton to *Keene*, was a delivery to *Simpson*. It does not purport to be so; and, the fair inference, from *Keene's* testimony, is, that it was given to him to hold the cotton, subject to his order, and to place it so on the black book, to avoid an immediate delivery to *Simpson;* and, that this was done, after consultation with *Bradley, Wilson & Co.*, and on account of rumors that *Simpson* was buying cotton beyond his means. The possession of the broker, under these circumstances, was not, as contended, the possession of *Simpson*, but the possession of *Bradley, Wilson & Co.*

But *Keene* had power to deliver the cotton to *Simpson*, the vendee of *Bradley, Wilson & Co.* No other meaning can be attached to their order, to the press, to deliver the cotton to him. Now, he did cause to be weighed, by the weigher of *Bradley, Wilson & Co.*, to be passed through the scales, and to be delivered, four hundred and sixty bales of the cotton. To whom did he deliver it? that is, for whom was it passed through the scales?

Not for himself. He had possession of the whole, by the order of *Bradley, Wilson & Co.;* and, in fact, held it for them. It was not passed through the scales for *Campbell* and *Rickarby.* His principals had nothing to do with them. He weighed and passed it through the scales for *Simpson*, because his principals had sold it to him.

This process, it is fully proved, is an actual delivery to the vendee. It was so considered, by both *Keene* and *Simpson;* for the latter gave orders, through *Keene*, to the press, to deliver it for shipment, and it was partly shipped. All that which was weighed was, therefore, in the possession and at the risk of *Simpson*, as owner. It was no longer at the risk of his vendors. Under such circumstances, he obtained an advance from the merchants, to whose order he consigned it, which covers all that was found in his possession, when the further delivery was stopped by *Bradley, Wilson & Co.* They had the right to stop the further delivery to *Simpson*, because he failed to pay the price; and, he could deliver no more to *Campbell* and *Rickarby*, because no more was delivered to him.

We concur with the district court, in the opinion, that the delivery of part of a divisible thing, is a delivery of that part alone, and not of the whole: as illustrated by the early case of *Durnford* v. *Brooks*, 3 M. R. 222. So the actual delivery of the whole, in block, completes the sale, even as to third persons, though the article is not counted, weighed, or measured, as decided in the case of *Morgan* v. *Shiff.*

The cotton was, therefore, wholly delivered by *Bradley, Wilson & Co.* to the broker, for the purpose of being delivered to their vendee, but only partly delivered by the broker to the latter.

It was the misfortune of *Campbell* and *Rickarby*, that they advanced on a symbolical delivery by *Simpson*, through *Keene* it is true, of that which had not been symbolically, much less actually, delivered to him. It is the misfortune of *Bradley, Wilson & Co.*, that their agent, in pursuance of power given to him, actually delivered to *Simpson* 460 bales of cotton, sold by them without receiving the price. By putting the property into the possession of the vendee, the vendor enabled him to commit a fraud, by obtaining the advance without paying the price; and equity obliges him to bear the loss, rather than the merchants

who, in good faith, made the advance to the owner, and actual possessor, of the 460 bales of cotton. *Russell* v. *Favier*, 18 L. R. 589. *The Barings* v. *Corrie & Co.*, 2 Barn. and Ald. R. 137.

Upon the whole, we are of opinion, that the judgment of the district court is correct, and affirm it, with costs.

SLIDELL, J., delivered the following separate opinion: *Bradley, Wilson & Co.* say, they had not given possession of the cotton to *Simpson*, their purchaser, because the weighing had not been completed, and they had not, in any manner, consented to the delivery; and they cite the 2433d article of the Civil Code, which says: "When goods, produce, or other articles, are not sold in a lump, but by weight, by tale, or measure, the sale is not perfect, inasmuch as the things so sold, are at the risk of the seller, until they be weighed, counted, or measured; but the buyer may require either the delivery of them, or damages, if any be for the same, in case of non-execution of the contract." In my opinion, the mutual rights and relations of *Bradley, W. & Co.*, and *Simpson*, are not the test of the rights of *Campbell* and *Rickarby*. They are third persons. What have *Bradley, Wilson & Co.* done, so far as plaintiffs are concerned? *B., W. & Co.* had cotton standing in their names, at *Penn's* press. Cotton so held, is subject to the order of the person who puts it there. *B., W. & Co.* give *Keene* a written order, addressed to *Penn*, as the keeper and proprietor of the press, directing him to deliver to *Keene* seven hundred and thirty-eight bales of cotton, mentioning the respective marks and numbers of the bales. As I understand the evidence, this order gave *Keene* the control of the cotton. The control of *Bradley, Wilson & Co.*, was divested. They ceased to be the holders of the cotton, as regarded third persons.

In this connection, the evidence of a proprietor of a cotton press in New Orleans, is very pertinent. He testifies, that he has known many instances, of cotton having been removed, on the order of the factor, without having been weighed. Cotton transferred by one factor to another, is seldom, or never weighed; and when shipped on planter's account, seldom, or never weighed; or if weighed in one press, and transferred to another, it would be delivered in the latter one, without being weighed.

*Keene*, thus invested with the control, transferred it, on the books of the press, to *Campbell, Rickarby & Co.*; and this he did at the request of *Simpson*, who had bought the cotton, and had got an advance from *Campbell* and *Rickarby*. But *B., W. & Co.* say, we did not intend *Keene* should part with the cotton, until *Simpson* paid us the price. If this was so, why did they give *Keene* an order, absolute in its terms? So far as the public was concerned, the order being absolute, rights acquired in good faith under it, cannot be disturbed. It is against well settled principles, to permit the secret instructions of a party to his agent, to qualify the apparent absolute control and dominion with which he has thought proper to invest him.

Again: *B., W, & Co.* have no equity, but the naked fact, that they have not received the price of what they sold. They not only clothed *Keene*, and through him, *Simpson*, with the *indicia* of ownership, but they did so, under circumstances which ought to have warned them of the danger of dealing with *Simpson*; for rumors, unfavorable to his credit, had reached their ears. *Keene* says, in his cross-examination by the plaintiffs, he had heard several reports, that *Simpson* was buying cotton beyond his means; that he had spoken to *Simpson* about these reports, and he had remarked to witness, that other parties were

furnishing him with funds, and he had only a quarter interest in the shipment. He also says, he knows from his transactions with *Simpson*, that it was his habit to take advances from the houses through whom it was shipped. Again, he says, in consequence of cotton falling rapidly in Liverpool, he became apprehensive that the parties who were furnishing him with funds, might withdraw, or the party through whom he was getting advances, might fail. And again : witness consulted with *Bradley, Wilson & Co.*, on the subject of these rumors, prior to the 27th May; that is to say, several days before they sold him the cotton in question. It is certain, that *B., W. & Co.* knew *Simpson* was in questionable circumstances, and it is reasonable to infer from the evidence, that he knew he would raise money to pay them, by advances from others.

I do not think, however, that in point of fact, *B., W. & Co.* intended, as between themselves and *Keene*, to make *Keene* a mere agent for the delivery of their cotton, upon payment of the money by Simpson. On the contrary, in giving him the control, they seem to have left matters to his discretion. *Simpson* had made other purchases of *B., W. & Co.*, and *Keene* thus speaks of them, and of his own authority in these matters: "Witness told *Bradley, Wilson & Co.*, whenever he bought cotton of them for *Simpson*, that he was buying for *Simpson's* account." "In his purchases from *Bradley, Wilson & Co.* for account of *Simpson*, he had no special instructions from *Bradley, Wilson & Co.*, to enter the cotton to his own order, but was left to his own discretion in the matter. He had informed *Mr. Wilson* of the rumors he had heard, and the mode he had adopted. *Mr. Wilson* appeared satisfied, but gave him no instructions." *Simpson* bought 3600 bales of *B., W. & Co.* upon the 21st May; and in one case, 911 bales were allowed to go on ship-board, before *Simpson* was called upon for payment. He gave them a check on account of its price, on the 7th June. It had been sold on the 31st May; was transferred on the black book of the press on the 4th June, and was on ship-board when the check was given.

Looking to all the facts of this case, I cannot but consider the plaintiffs as persons, who have been induced to advance *Simpson* money, upon the faith of property, of which he had substantially the apparent control, and the possession which *Keene*, at his request, transferred to them. I say possession, since a symbolical possession is, for the purposes of commerce, an actual possession.

*B., W. & Co.* have, on this occasion, done as others are too much in the habit of doing. It is quite too common here, to repose confidence in the buyer, and let him get the control of the merchandise, before the price is paid. Such a course of business, should not receive judicial countenance ; it enables speculators to go largely into the market, without real means; clothes them with an undeserved credit, and has been a prolific source of litigation and fraud. The consequence of such a course of business is, that occasionally, some one must suffer. In equity, the loss ought to fall upon the party who, by his imprudent confidence, has enabled the wrong-doer to get a credit with innocent third persons, to which, upon the true, but hidden state of facts, he would not be entitled.

It is said, however, that the advances were not, in legal contemplation, made on this specific cotton, but on the general credit of *Simpson* ; or, as it was put in the oral argument, an advance on the promise of a consignment, is not an advance upon a consignment.

It is true, that a portion of the money was advanced, before a transfer of the cotton was made on the books of the press by *Keene* to *Campbell* and *Rickarby*, and the receipts of *Simpson* for the advances, do not recite the specific bales.

One of them, that of June 5th, is " on account of shipment to Liverpool per Epaminondas;" and the other, that of June 7th, is simply, " on account." There is no doubt in my mind, however, that the first advance was made upon the faith of the expected consignment of the cotton in question; and when the second was made, the transfer on the book of the press had intervened. There was no notice of *B., W. & Co.'s* equity, nor any active intervention on their part, until after the whole amount of $24,000 had been paid to *Simpson* by the plaintiffs. I concur in what is said by the district judge, that although the advance be not simultaneous with the possession, the privilege attaches as soon as possession is acquired, in pursuance of the antecedent promise, and is effective where adverse rights are not in the mean time acquired. The cases he cites sustain this view. *Turpin* v. *Reynolds*, 14 L. R. 473. *Powell* v. *Aikin*, 18 L. R. 328. Whatever doubts we might have on the subject, if the question were *res nova*, those cases have the force of precedents, and it would operate unjustly, to disturb them now. I am therefore of opinion, that the plaintiffs should have a privilege on the whole lot of cotton transferred to them on the books of the press.